TOOLE et al. v. MOORE et al.

MOORE et al. v. AMERICAN LUMBER CO.

(No. 265.)

(Court of Civil Appeals of Texas. Beaumont. April 30, 1918. Rehearing Denied May 15, 1918.)

1. TRIAL ⊙139(1)—INSTRUCTION OF VERDICT.
The court cannot peremptorily instruct a verdict on any issue as against a party to a suit, where there is some evidence in his favor on the issue involved.

2. TRESPASS TO TRY TITLE ⊙41(4)—IDENTITY OF GRANTEE—SUFFICIENCY OF EVIDENCE.
In trespass to try title to and to recover possession of a league of land granted by the Mexican government to one John Moore, evidence *held* insufficient to warrant finding that the John Moore under whom plaintiffs claimed was the original grantee of the land.

3. APPEAL AND ERROR ⊙1003 — REVIEW—FINDING ON CONFLICTING EVIDENCE.
The Courts of Civil Appeals are not authorized to disturb a jury's verdict or finding on an issue of fact which has reasonable support in the evidence, though apparently against a preponderance of the evidence.

4. APPEAL AND ERROR ⊙1003 — REVIEW—VERDICT—SETTING ASIDE.
Where the evidence relating to a jury's verdict on a question of fact so clearly and overwhelmingly preponderates against the verdict as to make it clear to the appellate court that such verdict was wrong, it should be disregarded and set aside.

5. APPEAL AND ERROR ⊙212 — OBJECTION TO PEREMPTORY INSTRUCTION.
Where defendant in error presented in writing a request to the trial court for a peremptory instruction, which was given without objection from plaintiffs in error, plaintiffs in error cannot complain of the court's action in giving the instruction.

⊙For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Error from District Court, Sabine County; A. E. Davis, Judge.

Suit by M. G. Moore and W. H. Ratliff against the American Lumber Company, J. O. Toole, W. F. Goodrich, and others. To review judgment for plaintiffs as against all the defendants, except as against the American Lumber Company, for which judgment was entered, and to review the judgment for the company, defendants, except the American Lumber Company, and plaintiffs bring error. Reversed and remanded in part, and affirmed in part.

W. H. Ratliff and K. R. Craig, both of Dallas, Carter & Walker, of Center, and W. R. Cousins, of Hemphill, for plaintiffs in error. J. W. Minton and W. F. Goodrich, both of Hemphill, D. M. Short & Son, of Center, W. D. Gordon and F. J. & C. T. Duff, all of Beaumont, Hamilton & Hamilton, of Hemphill, and Terry, Cavin & Mills, of Galveston, for defendants in error.

HIGHTOWER, C. J. This was a suit in trespass to try title to and recover possession of a league of land granted by the Mexican government to John Moore on September 30, 1835, and situated on the waters of the Sabine river in Sabine county, Tex. The plaintiffs in the suit were M. G. Moore and W. H. Ratliff, and the defendants were American Lumber Company, J. O. Toole, W. F. Goodrich, H. B. Arnold, Harry Youngblood and his wife, Willie Youngblood, and R. L. Weathersby and his wife, Sidney Ann Weathersby.

All defendants were duly served and answered. The defendant Toole disclaimed as to 500 acres in the northeast corner of the league, and also as to 1,107 acres in the south portion, and as to the remainder pleaded "not guilty." Defendants Weathersby disclaimed as to all the league except a tract of 500 acres in the northeast corner, and as to this pleaded "not guilty," and also interposed the several statutes of limitation. Defendants Goodrich and Arnold disclaimed as to all except a one-twentieth interest in the 500 acres claimed by the Weathersbys, and pleaded "not guilty" as to the remainder. Defendant American Lumber Company answered by plea of not guilty, and also claimed the entire league under the statutes of limitation of three, five, and ten years.

The case was submitted to the jury upon special issues, as between all the parties except American Lumber Company, in whose favor the trial court peremptorily instructed the jury to return a verdict for 1,107 acres of the league, described by specific metes and bounds. The jury returned its verdict on the special issues submitted, and also its verdict in favor of the American Lumber Company, as peremptorily instructed by the court, and upon this verdict judgment final was entered in favor of the plaintiffs, M. G. Moore and W. H. Ratliff, as against all the defendants for all the land sued for, save and except as to the American Lumber Company, in whose favor judgment was entered for 1,107 acres of the league specifically described.

All the defendants, with the exception of American Lumber Company, in due time filed motions for a new trial, which were overruled, and the action of the trial court in that connection duly excepted to. The plaintiffs, Moore and Ratliff, also excepted to the court's judgment in denying them a recovery against the American Lumber Company, and plaintiffs filed a motion to set aside the directed verdict in favor of American Lumber Company and render judgment in their favor against that defendant on the verdict of the jury on the special issues submitted, or, failing in that, for a new trial as to the American Lumber Company. This motion by the plaintiffs was also overruled, to which action they excepted and the case has been brought here on two separate writs of error; J. O. Toole and the other defendants, with the exception of American Lumber Company, being plaintiffs in error in one writ, as against M. G. Moore and W. H. Ratliff, defendants in error, and M. G. Moore and W. H. Ratliff being plaintiffs in error in the other writ, as against American Lumber Company, the defendant in error. We shall first dispose of the writ of error prosecuted by J. O. Toole and others against M. G. Moore and others.

It appears from the record in this case that the league of land here sued for was granted by the Mexican government to John Moore on the 30th day of September, 1835, and it also appears from the record that on the 3d day of October, 1835, "John More," claiming to be the owner of this league of land and the original grantee thereof, executed a deed conveying the same to John James Porter and J. S. Lane. Upon this deed appear the names of the following persons as witnesses to its execution: William Richardson, Wm. J. Logan, S. J. Peck, John M. Dorye, and Thos. J. Rusk. This deed was proven for record at Nacogdoches before Chas. S. Taylor, chief clerk and ex officio notary public, by Thos. J. Rusk, one of the witnesses to said deed, on July 30, 1838, and was recorded in Sabine county on May 8, 1838. All the defendants in this case claim and deraign title by regular chain under this deed. It was the contention, however, of the plaintiffs below that this deed to Porter and Lane from the purported original grantee was a forgery, and this contention was one of the two main issues submitted for the consideration of the jury on the trial, and the jury found, in effect, that this deed under which the defendants claimed title to this league of land was a forgery, and this finding is made the basis of one of the main assignments of error found in the brief of plaintiffs in error J. O. Toole et al.

The record in this case is quite voluminous, and has been long and carefully considered by this court, and in some respects it pre-

sents most remarkable features. The plaintiffs in this case M. G. Moore and W. H. Ratliff, claimed to have been connected with the title to this league of land for the first time on the 7th day of July, 1913, in this way: It appears from the record in this case that on said last-named date a man by the name of John Moore, residing in Hardeman county, Tex., executed to the plaintiffs, Moore and Ratliff, two deeds, by which he conveyed to them this league of land, and it is claimed by said plaintiffs, M. G. Moore and W. H. Ratliff, that this Hardeman county John Moore, their vendor, was the same man to whom this league of land was originally granted by the Mexican government in 1835, and that he had never theretofore conveyed the same, and that they acquired title thereto by these deeds of July 7, 1913.

This man, John Moore, of Hardeman county, under whom these defendants in error, Moore and Ratliff, claim title, was present at the trial of this case, and testified as a witness, and the first main issue submitted by the court to the jury in this case was as follows:

"Is John Moore, the witness who testified in this case, the same John Moore to whom a league of land on the Sabine river, in Sabine county, Tex., was granted on September 30, A. D. 1835? You will answer this question 'Yes' or 'No,' as you may determine the fact to be."

To this question the jury answered "Yes." The other material question submitted for the jury's consideration was as follows:

"If you answer question No. 1 'Yes,' then you will answer the following question, but if you answer question No. 1 'No,' then you need not answer any other questions submitted to you. Did John Moore, the witness who testified in this case, convey the land sued for to James J. Porter and John S. Lane on the 3d day of October, A. D. 1835? You will answer this question 'Yes' or 'No,' as you may determine the fact to be."

To this question the jury answered "No." Thus it will be seen that the jury found that the John Moore of Hardeman county, who conveyed this league of land on July 7, 1913, to these defendants in error, was the original grantee of said land, and that he had not executed the deed to Porter and Lane, through and under which these plaintiffs in error claim title, which was, in effect, a finding by the jury that the purported deed from the original grantee to Porter and Lane was a forgery.

We shall now refer to the facts found in the record which are claimed by these defendants in error to be sufficient to support the jury's findings on these two issues. As stated above, the Hardeman county John Moore whom we will hereinafter refer to as John Moore, was present at the trial and testified in this case. His testimony is found in the record to cover nearly 50 pages, and, of course, it would be impracticable for this court to here detail all he said, but we shall make what we conceive to be a fair statement, in substance, of the

material facts to which he purported to testify. According to this witness John Moore, he was born in Hawkins county, Tenn., and was one of a family of nine children. He said that in 1834 he, in company with his brother William, who he said was two years older than himself, and also in company with Forg Mann and Jack Carmack and perhaps several others, came from Tennessee to Texas for the purpose of acquiring land here as colonists under the Mexican government, and that their objective point in Texas, on leaving Tennessee, was Nacogdoches, and that he and his companions made their way as directly as they could to Nacogdoches upon reaching Texas. He said that after being in Texas a little while Jack Carmack began to be dissatisfied, and wanted to go back to Tennessee, and that he was persuaded by Jack Carmack to return with him to Tennessee some time during the same year. He further stated that shortly after returning to Tennessee with Jack Carmack the latter received a letter from some of their companions at Nacogdoches, telling him to come back to Texas at once, and to bring the witness John Moore with him. He stated that acting upon this letter he and Jack Carmack, some time during the spring of 1835, returned to Texas and back to Nacogdoches, and that he (the witness) made application to the Mexican government shortly after his return, as a colonist, for land. He further stated that his brother William and Forg Mann, who was a cousin of his mother, and who had remained at Nacogdoches since first arriving there, were his advisors, and as such attended to the matter of acquiring the land for which he was an applicant; that he, himself, had so little knowledge pertaining to matters of that kind, he depended upon his brother William and Forg Mann entirely to secure for him the land he wanted. He further stated that after returning to Nacogdoches in 1835 he met and became acquainted with Arthur Henrie and David Brown, who were surveyors at Nacogdoches at that time, and who appeared to have a great deal of business to attend to in the way of surveying lands for colonists, etc.; and he stated that after formal application by him for land the same was granted, and that his title papers were delivered to and taken charge of by his brother William, but that he himself never saw the title papers, and did not know of his own knowledge what they contained, but that his brother William told him that his title papers were all right, and that he had secured his land. He further testified that on one occasion, when he and others of his companions, perhaps his brother William and Forg Mann, were riding along on the Sabine river in Sabine county, David Brown, who was one of the main surveyors in the vicinity of Nacogdoches, made a remark to this effect, "There's John's land," and at the same time

David Brown looked toward the witness, meaning John Moore.

This witness further testified that he thereafter (though the record is indefinite as to time, but not later than some time in 1837), again returned to Tennessee, and that he never again returned to Texas until 1850. He further testified that his brother William afterwards went to the war between the United States and Mexico, and remained in the war about one year, and returned to Tennessee, and that he and his brother again made preparations to return to Texas, and had about completed all arrangements to do so when his brother William was again prevailed upon to rejoin the army and return to Mexico. He stated that while packing their trunks, etc., to return to Texas, his brother William showed him a bundle of papers, and at the same time remarked, "Here are our Texas land papers," and that this bundle of papers was placed in a trunk but that the witness did not examine them, and did not know just what papers were in the bundle, but only knew what his brother stated about them. He further stated that his brother William, on deciding to return to the army, persuaded him also to join the army, and that he, in fact, joined the army, and in company with his brother William left Tennessee, and entered the war between the United States and Mexico. He further stated that his brother William was killed in the war, and that he himself returned from the war to Tennessee, and was discharged at Memphis in 1848. He further stated that soon thereafter other acquaintances and companions of his in Tennessee became anxious to come to Texas, and that he, along with them, about 1850, started back to Texas, traveling by boat, and that he had with him on the boat two trunks, a grip, etc., and that one of these trunks contained his title papers to his Texas lands. He further stated that when his boat was within about 40 miles of New Orleans on the Mississippi river, it came in contact with another boat, and that the boat on which he was traveling was thereby caused to sink so rapidly that he did not have time to save all of his baggage, and that the trunk containing his title papers to his Texas lands was lost and sunk in the Mississippi river, and that he never thereafter saw or heard of his title papers. He further testified that, notwithstanding this calamity, he continued his voyage on to Texas, and finally reached Lockhart, Tex., some time in the latter part of 1850, or first part of 1851. He further testified that in 1854 he was married to a Miss Elliott at Lockhart, Tex., and that this wife lived a number of years, and that there was born to this union in all nine children; that this wife died some time after the Civil War, about 1868 perhaps, and that shortly thereafter he married the second time.

·According to the record, as shown by this witness' own testimony, he lived in Caldwell, Milam, and Williamson counties from 1850, or 1851, until very recent years, and that during all of this long period of time he lived within a distance of 30 or 35 miles of Austin, where the land office of this state has been continuously situated and kept, and according to his own testimony the only effort even amounting to as much as the writing of a letter to make any inquiry or lay any claim to the land here in controversy, or any other land in Texas, was in 1853, at which time he says he took a notion to go to Austin, and see what he could find in the land office there relative to his land. He stated that when he got to Austin on that occasion he found the town infested with rangers, many of whom seemed to be drunk and carousing, but that he made inquiry for the land office, and finally went to the building to which he was directed, and at the front door met a "big man," who was armed and seemed to be drunk, and to whom he made some inquiry about the land office, and stated that he wanted to see something about his "land papers." He said that this big man spoke to him very abruptly, and told him that the land office had been burned, and that he did not have any land papers there, and that seeing that the man was drunk and that he might have trouble with him, which he did not want, he immediately left Austin and returned to Lockhart. From that day on until 1909, the record in this case shows, without contradiction, that this man John Moore, of Hardeman county, under whom these defendants in error claim this league of land, never made a single effort of any character whatever to ascertain any fact concerning this league of land, not even so much as to write a letter, notwithstanding the fact that he resided such great length of time within a few miles of the capital of the state, where the land office is situated, in the archives of which was to be seen, upon mere request, perfect and undisputable evidence of his title to this league of land, if, in fact, such title was ever in him. But he attempts to account for this absolute and long-continued nonclaim because of the fact, as he says, that he had lost his title papers in the Mississippi river, as the principal reason, and also because he understood that the land was of very little value.

As a matter of fact, as disclosed by the record in this case, without contradiction, the first time that this Hardeman county John Moore conceived the idea of asserting any claim of title to the land in controversy was in 1909, and his claim arose in this way: He was on a visit to a granddaughter in Runnels county, Tex., and while there met some old soldier, and together they were discussing the hardships, etc., which they had undergone as soldiers and prisoners of war, and this granddaughter overheard this conversation and became interested, and told this John Moore that she wanted to write his history and put it in the paper, and she

proceeded to do this, and published her piece in the Dallas News. John Moore testified, if we mistake not, that on the very next day after this history was published in the Dallas News he began to receive letters from persons in different portions of the state who were desirous of taking up with him land matters, and from such inquiries he was led soon thereafter to make a visit to Sabine county, and it appears from the record that upon reaching Sabine county and consulting with certain persons there with reference to abstracts, etc., he first laid claim to a league of land that was granted by the Mexican government in 1835 to a man named John Moore, but this league of land was out in the piney woods on what is known as Bear creek, and was nowhere near the vicinity of the league of land in controversy situated on the Sabine river, and which, he says, in effect, was pointed out as his land by David Brown in 1835. The record is not definite as to how long he continued to lay claim to this piney woods league of land, but it does appear that he sold his claim thereto, or rather quitclaimed title thereto, and then actively prosecuted his claim for the league in controversy.

This Hardeman county John Moore stated, while a witness on the stand, that he did not know his exact age, and could not even tell the year in which he was born, but says that he was a very young man when he came to Texas, and that this league of land was granted to him as a colonist, and that he never conveyed the same to Porter and Lane, or to any one else.

On the trial of this case below, the defendants introduced in evidence an application for a pension made to the Pension Department of the United States by this John Moore of Hardeman county, by which he claimed to be entitled to a pension for services as a soldier in the Mexican War. This application was made in 1884, and in such application this John Moore swore that he was born on January 1, 1830, in Hawkins county, Tenn., and went on to detail many other matters connected with showing his antecedents, etc. This application for pension was duly granted, and in 1908 this same John Moore again made application to the Pension Department for an increase in his pension, and in this second application he again stated, and swore to the statement, that he was born on the 1st day of January, 1830. Upon being confronted with these sworn statements, which he admitted making, as to the date of his birth, the witness undertook to explain the same by saying that as a matter of fact he did not know his exact age, and that this statement to the Pension Department as to the date of his birth was based upon a "record" that was made by a brother-in-law of his, back in Tennessee, under the following circumstances: He said that he had a sister named Betsy, and that she married a man named Jim Marion; that Betsy was his oldest sister, and

was several years older than himself, and that one day while this sister and brother-in-law were visiting at his mother's house his brother-in-law told his mother that Betsy had told her husband her age, and he (the husband) wanted to know of the mother if Betsy had given her correct age; that Jim Marion stated to the mother the age that Betsy had given him, which witness could not remember, and again asked the mother if that was correct, to which the mother replied, substantially, "I reckon so," or something like that, and thereupon Jim Marion asked his mother the difference in the ages of her children, and the mother replied that the difference was between 18 months and 2 years, and that thereupon Jim Marion commenced to figure with a pencil and piece of paper, and accepting Betsy's age to be as stated to him by her, and figuring that there was 2 years' difference between the ages of the children, he reached the conclusion that the witness John Moore was born in January, 1830, and so just stated on the memorandum that witness was born January 1, 1830. He stated that the "record" as made by his brother-in-law was the only record that he ever had or knew of as to his age, or that of any of the other children, and that having no better record, and being in doubt of his correct age, and being desirous of obtaining a pension, and being informed by the authorities to whom his application pertained that it was necessary to state his age in the application, he just decided that he would accept the record as made by his brother-in-law, and say that he was born on January 1, 1830. He stated, however, on the stand, that he was satisfied that Betsy had deceived his brother-in-law, and had caused all this trouble to himself in doing so.

As bearing upon the age of the said John Moore, of Hardeman county, plaintiffs introduced the evidence by deposition of J. M. Baldwin, a nephew by marriage of this John Moore, and this witness testified that according to family history and tradition, as he remembered it, this John Moore was, at the time of the taking of the deposition in 1915, 100 years old, or maybe more, but we find upon close examination of the record that the testimony of this witness as to John Moore's family history contradicts, in material respects, that of John Moore himself. Also the plaintiffs below introduced the deposition of Mrs. Betty Thompson, who testified that she had lived in the same community with the Hardeman county John Moore for about 20 years while he lived in Milam county, and it is her opinion that said Moore was about 95 years old in 1915. Also the plaintiffs introduced the deposition of G. W. Radford, a physician, who testified in 1915 that he had known this John Moore for about 20 years, and had treated him professionally, and that he would think that John Moore is somewhere between 90 and 100 years old. Also the plaintiffs introduced the deposition of

Calvin Marshall, taken in 1915, and he testified that in his opinion John Moore was, at that time, about 90 years old; that he had known him for about 23 years.

The defendants below, among other things, introduced on this point the deposition of J. C. Elliott, taken in 1915, who testified that he was 76 years old at the time, and that he had known the Hardeman county John Moore approximately 60 years; that John Moore's first wife, Miss Elliott, was witness' cousin; that when witness first met John Moore he appeared to be between 23 and 25 years of age; and that he has known John Moore intimately ever since that time. He further testified that this Hardeman county John Moore often spoke about his age during the time witness knew him, and that it was frequently mentioned by this John Moore that he was just 9 years older than this witness. The witness further stated that he never in his life, although knowing John Moore intimately for more than 60 years, heard him say that he was in doubt of his true age, and never on any occasion heard him mention the "record" made by his brother-in-law, Marion, nor anything in that connection; that he always spoke of the date of his birth as being January 1, 1830, and seemed to have no doubt of its correctness. Also the defendants introduced the deposition of Mrs. Sarah Styles, who testified that she was 68 years of age; that she had know the Hardeman county John Moore for more than 60 years; that he married witness' sister, Miss Elliott; that witness had often heard this John Moore say that he was born January 1, 1830; and that he never at any time during all the years she had known him claimed that he was in doubt as to his correct age. Also defendants introduced the deposition of W. S. Elliott, who testified that he was 70 years old; that he had known the Hardeman county John Moore for a period of 63 years, having first met him in 1852, and further testified that Miss Elliott, John Moore's first wife, was witness' sister, and further that he had heard Moore say many times during the many years he had known him intimately that he was born January 1, 1830, and that John Moore never, in all these years, expressed any doubt of his correct age. The witness further stated that in his opinion the Hardeman county John Moore was about 85 years of age.

It was further shown by J. W. Minton, an attorney residing at Hemphill, that some time in the winter of 1911 the Hardeman county John Moore came into witness' office making inquiry about land, and asked him something about abstracts, and that upon that occasion this John Moore told Minton that he was then 82 years old, and, according to Minton, Moore further stated to him on that occasion that he (Moore) did not come to Texas himself to get the land, but that his "folks" came to Texas and got the land for him. Substantially the same facts were testified to by J. A. Watson. Also, as bearing upon the issue of identity of the Hardeman county John Moore with the original grantee of the land in question, the plaintiffs below introduced another witness, John Pickering, who testified that he was born on the 1st of January, 1818, in the state of Mississippi, and that he came to Texas in 1836, and shortly thereafter entered the war between Texas and Mexico then going on, and was one of the participants in the battle of San Jacinto. This witness further testified that after leaving the vicinity in which this battle was fought, and some time early in the spring of the following year, he made his way to Shelby county, Tex., and there fell in company with some of the early surveyors in that part of the country, among them being Arthur Henrie and David Brown; that witness followed the gambler's profession at that time, playing mostly the game of "seven-up," of which he was very fond, and that he had many times played the game with old David Brown, whom he called "Uncle Dave," and that he had won many a dollar from David Brown in this game. He further testified that some time during the year 1837, and while he was following the camps of these old surveyors, he became acquainted with two young men whose names he understood to be William Moore and John Moore; that these young men claimed to be brothers, and also claimed that they were from Hawkins county, Tenn. He stated that William seemed to be a little older than John, and that John seemed to be a little older than this witness. He also stated that he met at that time in that vicinity a man by the name of Foard Mann (it was claimed by the plaintiffs that Forg Mann was the man referred to by witness), and, among other things, the witness further stated that on one occasion he carried a note written by Arthur Henrie to David Brown, and delivered this note to this young man who called himself "John More." He further stated that, as he understood the contents of this note, it was in substance a direction from Arthur Henrie to David Brown to show this young man, John Moore, his land, and witness stated that this matter was unusually impressed upon his mind at the time, because of the fact that the spelling of the name "More" on this note was different from the way the name Moore was always spelled, so far as this witness knew, and he remarked to himself at the time that it was strange that a man of David Brown's ability and business experience and supposed education, etc., wouldn't know how to spell "Moore," and, if we mistake not, he testified that he called David Brown's attention to this in a little pleasantry, and David Brown replied that this young man, John More, spelled his name with one "o," and not with two "o's," as usual. The witness further stated that he only saw this young man who called himself John Moore a time or

two in those days, and perhaps never had more than one or two conversations with him in his life, and never met him again thereafter until a few days before this case was called for trial—something more than three-quarters of a century. And he further testified that while, of course, he could not undertake to say that the Hardeman county John Moore, who testified in this case, was the same young man who called himself John Moore in 1837, and could not identify him as being the same man, yet it is apparent from the record in this case that this witness would have sworn that he believed this Hardeman county John Moore was the same John More that he had met in 1837, basing such belief upon statements made to witness by the Hardeman county John Moore a day or two before the trial below. This belief on the part of the witness seemed to be based principally upon the fact that this Hardeman county John Moore had, during a conversation just before this trial, mentioned to witness the name of another man whom the witness met and knew well in that vicinity in 1837, and whose name was "Colonel" Pickett. These are substantially all the facts that the witness Pickering detailed that would have any tendency to prove that this Hardeman county John Moore was the same man to whom this league of land was granted in 1835.

On the trial below, in addition to the evidence introduced by the defendants, as hereinbefore mentioned, they also produced the original testimonio, which was delivered by the Mexican government to the original grantee of this league of land at the time the grant was extended, which instrument, it was shown, came from the proper custody, and about which there was no question as to its genuineness. It will be remembered that at the date of the grant of this land the law of the Mexican government provided the method of extending titles, and that the method adopted at that time was to execute what was called the protocol, which was kept on file by the Mexican government as an archive, and the testimonio, which was simply a copy or, as frequently termed, duplicate original of the protocol, was delivered to the colonist as the evidence of his title to the land granted. This original testimonio, we repeat, written in the Spanish language, was produced and introduced in evidence by the defendants in this case, and it was nowhere shown that the Hardeman county John Moore ever had in his possession or saw this instrument, but his only claim in that connection is that his brother William had whatever title papers there were to this land, and that these title papers were lost in the Mississippi river in 1850.

The defendants below also produced from the proper custody and introduced in evidence what purported to be the original deed from the original grantee of this land to Porter and Lane, dated, as before stated, Oc-tober 3, 1835, the execution of which was witnessed and proved for record, and recorded as shown in the beginning of this opinion, and this is the deed that these defendants in error, M. G. Moore, and W. H. Ratliff, claimed was a forgery. In addition to this, the record discloses that Porter and Lane, claiming under this deed to them, commenced to assert their ownership of this land, and same was conveyed down through the years, by mesne conveyances by their successors in title, claiming under this deed, which these defendants in error claimed was a forgery, and said Porter and Lane and their successors in title, claiming under and through this deed, have continued to assert ownership and exercise actual ownership by dealings in and conveying this land from one to another, which deeds have been placed of record, during all of which great length of time no claim of any character whatever has been asserted thereto by the Hardeman county John Moore, or by any one claiming under him, until shortly before this suit was filed, as stated in the beginning.

We might mention other strong circumstances appearing from this record tending to show that the claim of title set up by the Hardeman county John Moore to this league of land was not well founded, but we think that we have already stated enough to show that this court is clearly justified in the conclusion we have reached in this case, and we shall therefore not incumber this opinion with further details.

Now, it is first contended by these plaintiffs in error Toole et al. that the trial court was in error in declining to peremptorily instruct a verdict in favor of all defendants as against the plaintiffs below for all the land claimed by them respectively, and under this assignment plaintiffs in error contend that, there being no evidence going to show that the deed from the purported original grantee to Porter and Lane was a forgery, and having connected themselves by mesne conveyances with the title conveyed by that deed, they were entitled to recover the land as against the plaintiffs.

[1] We cannot sustain this assignment, for the reason that we cannot correctly say that there was no evidence to go to the jury on the issue of forgery of said deed, because the testimony of the Hardeman county John Moore himself was some evidence on that issue, and the rule in this state being, as we understand it, that the court cannot peremptorily instruct a verdict on any issue as against a party to a suit where there is some evidence in his favor on the issue involved, we must therefore overrule this assignment.

[2] The next assignment raises a different question, however, and by the same it is contended that the burden of proof being on the plaintiffs below to prove title to the land in controversy, in order to recover the same from the defendants, and plaintiffs having

failed to do so by evidence legally sufficient, the trial court should have set aside the verdict of the jury in favor of the plaintiffs and granted the defendants, against whom recovery was had, a new trial. This assignment we have concluded, after very careful consideration, we must sustain. The facts we have mentioned above relate to both of the main findings made by the jury in this case; that is (1) that the Hardeman county John Moore was the man to whom this league of land was granted in 1835, and (2) that he did not convey the same to Porter and Lane. After very careful consideration of the entire record in this case, we have reached the conclusion that the evidence introduced on the trial below, as reflected by this record, considered as a whole, was unsufficient to warrant a finding by the jury that the Hardeman county John Moore, under whom the plaintiffs below claimed this league of land, was the original grantee of this land; and, of course, if he was not such, then it follows, without any room for controversy, that there was no proof whatever and no necessity for any proof whatever that the deed of October 3, 1835, from the purported grantee to Porter and Lane was a forgery.

[3, 4] In reaching this conclusion in this matter we have not been unmindful of the rule obtaining in this state that our Courts of Civil Appeals are not authorized to disturb a jury's verdict or finding on an issue of fact, where that verdict or finding has reasonable support in the evidence, although it may appear to the appellate court that such verdict or finding is against what they conceive to be a preponderance of the evidence relating thereto. That rule is firmly established in this state, and we have no inclination to question, in fact do not doubt, its wisdom; and it may be found that only in rare instances has this court disturbed the verdict or finding of a jury on any question of fact in any case decided by this court, and then only where, in the opinion of this court, the verdict or finding was overwhelmingly and manifestly against the preponderance of the evidence, and appeared to this court to be clearly wrong. We are not unmindful of the fact that loose expressions may be found in the reported cases to the effect that where there is any evidence in the record in support of a jury's verdict or finding then the appellate court cannot disturb such verdict or finding, but it will be found, we think, upon examination of the authorities where such expressions were used, that the court using such expressions did not mean for such language to be construed literally, but only meant that where the evidence was reasonably sufficient to support the verdict of the jury, it would not be disturbed by the appellate court. Our appellate courts have always held, with practical unanimity, that a jury's verdict on a question of fact should not be disturbed where the evidence relating thereto was

merely contradictory, or where it was a question of mere credibility of witnesses, and the evidence as a whole is reasonably sufficient to support the verdict, but all the Courts of Civil Appeals in this state have held that where the evidence relating to a jury's verdict on a question of fact so clearly and overwhelmingly preponderates against the verdict as to make it clear to the appellate court that such verdict was wrong then such verdict should be disregarded and set aside by the appellate court, and in this case this court has been constrained to conclude that the evidence clearly and overwhelmingly preponderates against the verdict of the jury on both of the main issues submitted to it, and so much so that this court feels compelled to say, in the discharge of its duty, that the verdict is clearly wrong. It would serve no useful purpose to here dissect and analyze by way of argument this evidence, and in view of another trial we think best not to do so. We therefore only say in conclusion that the assignment of the plaintiffs in error Toole et al., challenging the verdict of the jury in this case for lack of sufficient evidence to support it and the judgment of the trial court in refusing to grant a new trial upon the same ground, is sustained, and the judgment to that extent is reversed and the cause remanded, as between said plaintiffs in error Toole et al. and the defendants in error M. G. Moore et al.

We now take up the case as brought here by the writ of error of M. G. Moore et al. v. American Lumber Company. As stated in the beginning of this opinion, upon conclusion of the evidence below, the trial court granted a peremptory instruction requested by defendant in error American Lumber Company to the jury, directing the jury to return its verdict in favor of said defendant for a particular 1,107 acres in the league of land sued for, and upon that verdict entered judgment in favor of said defendant for that portion of the league. The main assignment of the plaintiffs in error on this phase of the case challenges the correctness of the action of the trial court in giving this peremptory instruction. The trial court in giving this peremptory instruction assumed, as appears from the record, that the American Lumber Company proved its title to this 1,107 acres under its pleas of limitation, and that the proof on that question was in such shape as to authorize the court in treating the issue as one of law only, and therefore required a peremptory instruction.

[5] At the threshold of this part of the case, we are met with an objection interposed by defendant in error American Lumber Company to a consideration of this assignment by plaintiffs in error, based on the ground that the record in this case does not show that any objection or exception to the giving of this peremptory charge was made by the plaintiffs in error in the court below, and it is contended that in the absence of

such showing by the record any assignment based upon the giving of such peremptory instruction should not and cannot be considered by this court. It appears from the record that this defendant in error presented in writing a request to the trial court for a peremptory instruction, which was given as above stated, and it nowhere appears in the record that any objection to the giving of this charge was made by the plaintiffs in error. Nothing in the way of a formal bill of exception or any other character of objection or exception was taken or made by the plaintiffs in error to this action on the part of the trial court. The question is therefore squarely presented whether this court is authorized to consider this assignment and review the action of the trial court in giving this charge.

It is suggested by the plaintiffs in error that this action of the trial court constituted fundamental error, and that no objections of any character to the court's action in giving this peremptory instruction was required, and that this court is authorized to review that action, even without a formal assignment of error in the trial court. Upon examination of this question, we find that each of the Courts of Civil Appeals of this state has had occasion to pass upon the same, and we find that each of them, with the exception of the Galveston and Amarillo courts, have held that, in order to entitle a party to complain of the trial court's action in giving a peremptory instruction, timely and 'proper objection must be made thereto before such charge is given to the jury, and the action of the court upon such objection must be properly reflected by the record. We agree with these several Courts of Civil Appeals, and hold that this court is without authority to consider this assignment of error, and without discussing the matter further, we cite the following authorities in support of our holding: Hendrick v. Blount-Decker Lbr. Co., 200 S. W. 171; Thorne v. Dashiell, 189 S. W. 986; Carr v. Pecos Valley State Bank, 189 S. W. 988; Railway Co. v. Dickey, 108 Tex. 126, 187 S. W. 184; Railway Co. v. Wheat, 173 S. W. 974; Needham v. Cooney, 173 S. W. 979; Railway Co. v. Feldman, 170 S. W. 133; Case v. Folsom, 170 S. W. 1066; Bohn v. Burton-Lingo Co., 175 S. W. 173; Railway Co. v. Wilson, 176 S. W. 619; Denison v. McAmis, 176 S. W. 621; Donaldson v. McElroy, 184 S. W. 1100; Commonwealth v. Bryant, 185 S. W. 979; Strong v. Harwell, 185 S. W. 676; McCall v. Roemer, 186 S. W. 409; Walker v. Haley, 181 S. W. 559.

If we are correct in holding that the plaintiffs in error on this phase of the case waived their right to complain of the action of the trial court in peremptorily instructing in favor of defendant in error American Lumber Company for the portion of this league of land recovered by it, then it would be useless to consider other minor assignments of error in this connection, for the reason that even if this court should sustain them its action in doing so could not have the effect to reverse the judgment in favor of this defendant in error as to the portion of the land recovered by it.

It follows from what we have said that the judgment of the trial court in this case, in so far as the same affects the plaintiffs in error Toole et al. and the defendants in error M. G. Moore et al. must be reversed, and the cause as to them remanded for a new trial; but the judgment, in so far as it relates to the 1,107 acres of land recovered by the defendant in error American Lumber Company against the plaintiffs in error M. G. Moore et al. should be affirmed, and it is so ordered.

Reversed and remanded in part, and in part affirmed.