**HINES, Director General of Railroads v. ROAN.  (No. 645.)**

(Court of Civil Appeals of Texas. Beaumont. Feb. 15, 1921. Appellant's Motion for Rehearing Granted April 23, 1921. Appellee's Motion for Rehearing Denied May 18, 1921.)

1. **Death ⊜99(4)—$20,000 for death of wife not excessive.**

An award of $20,000 in favor of plaintiff for the death of his wife, who was 26 years old, in good health, kept her house, and was faithful in the discharge of her wifely duties, is warranted.

2. **Death ⊜99(3)—$15,000 for death of four year old son excessive.**

Where the court limited the recovery of plaintiff for the death of his son to the value of the son's services during minority after deducting the probable expense of maintenance, an award of $15,000, the son being only four years old is so excessive that it cannot be cured by remittitur, for it is obvious that the son could not have earned during his minority an amount above the expense of his maintenance to reach $15,000.

On Motion for Rehearing.

3. **Witnesses ⊜321 — Party introducing witness vouches for him.**

A party introducing a witness vouches for his integrity and veracity.

⊜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Railroads ⟨⇒348(6) — Finding automobile driver not guilty of contributory negligence held contrary to evidence.**

In an action for the death of plaintiff's wife and son, who were killed when an automobile the wife was driving was struck by a train, a finding exonerating the wife of contributory negligence *held* so contrary to the great preponderance of the evidence in view of the award of damages and the disregard of other testimony as to show prejudice on the part of the jury and necessitate reversal.

**5. Evidence ⟨⇒586(3,4)—Affirmative evidence is entitled to more weight than merely negative evidence.**

Affirmative evidence such as that witnesses heard a whistle is entitled to more weight than merely negative evidence.

**6. Evidence ⟨⇒588—Jury are judges of credibility of witnesses.**

The jury are the judges of the credibility of witnesses, but they have no right to arbitrarily reject the evidence of unimpeached and apparently disinterested and unbiased witnesses against whom there are no discrediting circumstances.

**7. Evidence ⟨⇒588 — Jury have no right to deny proper weight to undisputed facts.**

The jury, while the judges of the weight of the evidence, are not entitled to deny proper weight to undisputed facts.

**8. Appeal and error ⟨⇒1003 — Verdict manifestly against preponderance of evidence should be set aside.**

Where a verdict is manifestly against the weight and preponderance of the evidence, it should not be allowed to stand, but the appellate court should reverse and remand the cause.

Walker, J., dissenting.

Appeal from District Court, Orange County; T. O. Adams, Judge.

Action by W. B. Roan for the death of his wife and son against Walker D. Hines, Director General of Railroads. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

F. J. & C. T. Duff, of Beaumont, and Ed. S. McCarver, of Orange, for appellant.

Buffington & Leigh, of Anderson, and D. C. Bland, of Orange, for appellee.

WALKER, J. Plaintiff, appellee, alleged that defendant, the appellant, negligently killed his wife and baby in a railroad crossing accident in the city of Orange on or about the 10th day of October, 1918. The grounds of negligence were that defendant failed to blow the whistle or ring the bell as it approached the crossing, and that it was operating its passenger train at a dangerous rate of speed in the corporate limits of the city, in violation of a city ordinance limiting the speed to six miles per hour. No question is made as to the finding of the jury on the last issue, because all the testimony for both parties shows that defendant was negligent in this respect. We sustain the findings of the jury as to negligence in failing to ring the bell and blow the whistle. These issues were sharply contested, but, as the verdict of the jury is sustained by the positive testimony of the witness B. C. Hare, we do not feel justified in setting it aside. Appellant's exception to the manner in which these issues were submitted to the jury was not raised until its motion for new trial was filed. Hence it comes to late for our consideration.

Defendant answered by plea of contributory negligence, and this appeal rests on this issue. As we construe the testimony, it appears, without dispute, that the railroad track is level and straight for two or three miles east from the Park street crossing; that the train was approaching from the east; that the right of way was 50 feet wide, and when one was approaching this crossing on Park street, after reaching the property line 50 feet from the center of the track, there was no obstruction to the view of an approaching train from the east except a line of telegraph poles; that back as far as 220 feet from the center of the track one approaching the crossing on Park street, as did Mrs. Roan, could see a train approaching from the east as far down the track as 800 or 900 feet, there being no obstruction to the view of such approaching train except the line of telegraph poles above referred to. On the evening of the accident, Mrs. Roan, with her little boy, four years old, her mother-in-law, and sister-in-law, was driving on Park street toward this Park street crossing. Her sister-in-law was on the seat with her and her mother-in-law and little boy were on the back seat. Just as they reached the crossing the approaching passenger train hit the automobile, killing Mrs. Roan, her little boy, and her mother-in-law. Her sister-in-law, Miss Mavis Roan, who was riding in the seat with her, seems to have escaped without injury. She testified that they had been riding over town, and:

"When we started home, Zollie said, 'Mavis, you get up on the front seat with me; I hate to ride on the front by myself;' and I got up on the front with her. We were coming—we had passed Dr. Thomas', and she said, 'Mama, Dr. Thomas is living in his garage until his house is fixed.' He was our doctor. I glanced back. I noticed she slowed up; then is when I heard the crash. Previous to the time I heard the crash the car slowed up; when it slowed up we were real close to the track.

"Q. And you felt the car slow up and you saw her glance up the railroad track? A. Yes, sir.

"Q. Had you seen Mrs. Roan just previous to that, or were you talking about the house? I mean just previous to the time that you saw her look up the track? A. Had I seen her?

"Q. Were you looking at her or were you in

⟨⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

a conversation? A. Well, we were just talking.

"Q. Talking along? A. Yes, sir. I did not hear the bell ring or the whistle blow, I did not hear a sound. The first thing I knew after being driven up on the railroad track was the crash when the train hit our car. I mean when I say I glanced around that I noticed she slowed up, and I looked to see why. She hadn't been going fast, and she slowed up, and that was real slow, and I looked back at Mr. Thomas'; she was coming down the stairs at her house with her little boy. I don't know whether she was looking in our direction or not. I never was unconscious at all. After the crash the first thing I know Mr. Joe Howell came and said, 'Here is Wright Roan's wife and kid and sister, and he picked me up. I don't know what happened to me when the train struck the car, I was on the front seat when it happened, and they picked me up from the back seat."

B. C. Hare, witness for plaintiff, saw the accident, and described it as follows:

"My initials are 'B. C.' I will soon be 22 years of age, and I have lived in Orange all my life. On the 10th day of October, 1918, I was about a block and a half from the Park avenue crossing of the T. & N. O. railroad track and remember the accident which occurred in which Mr. Wright Roan's wife, mother, and son were killed. At the time of the accident I was between Orange and Cherry streets, about 10 or 18 feet from the railroad track on the west side towards the business section of Orange, and I purchased a newspaper from a boy. At the time I got the newspaper from the boy I was standing in the middle of the track, and I saw the train coming down the track about six blocks away from Park avenue. I bought the paper, stepped aside, and saw the car coming. I was then 10 or 12 feet from the railroad track. The car was on Park avenue going east toward the crossing. When I first saw it, it was about 50 or 60 feet from the crossing. It slowed down for the crossing, and the lady looked like to me she was looking down the track, and when she got within about 20 feet of the railroad she speeded up to go on over, as well as I could see. There is a little rise on that railroad track there of the street to go over the railroad. I have been to that spot lately where I saw that lady glance up the railroad track and looked in that direction, and I could see about a block and a half up the railroad track. At the time she glanced up in that direction the train was about four or five blocks up the track somewhere (indicating) about that big double cattle guard. When she started across the railroad track I saw the train coming on; it was traveling at a fast rate of speed. I did not hear the whistle or the bell ring, nor did I see any member of the train crew give any signal to warn persons crossing Park avenue that the train was approaching. I was looking at the train and did not see any steam rise from the whistle evidencing that the whistle had been blown. I could not see either the fireman or the engineer; they were coming towards me. From the time that I secured the newspaper and walked across the railroad track the train had gone from where I first saw it to where it came in contact with the car. After the train struck the car it looked like to me it carried it a half block before it ever got off."

The next morning after the accident Mrs. Thomas made the following statement, which was offered by the defendant:

"My name is Mrs. J. H. Thomas. I am 38 years of age, and am the wife of Dr. J. H. Thomas, of Orange. We live one block north and one-half block east of Park street crossing. On yesterday afternoon when the train struck an auto driven by Mrs. Wright Roan I was on Park street going toward the crossing with my little six year old son, Norvell, not more than one block north of the crossing. My house is situated on Twelfth street one-half block east of Park street, and as I was about to reach Park street the auto passed me. Twelfth street is the first street north of the track. As the auto passed me Mrs. Wright Roan turned around and looked at me, and then made some remark to the lady riding on the front seat with her, and then both ladies turned their heads around and looked at me again. I was on the east side of the street, and as Mrs. Roan looked at me she turned her head to the east looking over her left shoulder on both occasions. The auto was running at a moderate rate of speed (not more than 8 or 10 miles an hour), and after looking at me for the second time, and when Mrs. Roan looked back toward the train the auto was then about three-fourths of a block from the crossing. Before the automobile passed I had heard the train coming, but am not positive as to whether I heard it blow until just before it reached the crossing. The block north of the crossing and east of Park street is open, and I thought sure Mrs. Roan and the others knew the train was coming, as there was nothing to keep them from seeing it, and as I continued to watch the car I saw it was not stopping, and as I could see the train I was certain the car was going to be struck. The auto did not slow down but little, if any, until it reached the track, or about the track, and then I saw Mrs. Roan trying to stop the car. The auto appeared to jerk or lurch two or three times before the engine hit it, and I do not believe Mrs. Roan stopped it before it was struck. If she did it was right in the middle of the track. I do not think the auto slowed down but very little until the track was reached, although I am sure Mrs. Roan was trying to set the brake. It jerked and jumped forward two or three times just before it was struck. The driver of the car was a small lady, and it appeared that the car first started to jumping or lurching when it was more than half the distance up the dump. As the engine hit the auto I closed my eyes and threw my hands over my face, at the same time screaming. * * * In approaching the crossing, the train did not appear to be running unusually fast. I would say it was running about the usual speed. * * * Between the point where I was standing, which is about three-fourths of a block north of the crossing and the railroad crossing, there were no other automobiles or persons that I saw, and I am sure there were none about the crossing. As I have stated above, there was absolutely nothing to have obstructed the view of the occupants of the car of the

approaching train, and I am positive they did not look in the direction of the train until it was too late to stop."

Appellant contends that Mrs. Roan was guilty of contributory negligence as a matter of law. We do not think so. Railway Co. v. Trochta (Tex. Com.App.) 218 S. W. 1038; Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S. W. 139; Railway Co. v. Price, 222 S. W. 628.

This issue is not a question of what Mrs. Roan could have done, but what an ordinarily prudent person would have done under the same or similar circumstances. Railway Co. v. Arrant, 225 S. W. 768. She was driving over the city with her family. Her mother-in-law did not often go with her. They passed where Dr. Thomas was living. He was building a new home, and at that time was living in his garage. He was the family physician. What was more natural than that she would call this fact to the attention of those with her in the car? In speaking to her mother-in-law, who was on the back seat, she turned her face from the railroad track. So did Miss Mavis. In looking towards Dr. Thomas' home, she had to turn her face from the railroad track. The testimony in this record; as copied above, is sufficient to sustain a finding that these facts distracted the attention of these women from their danger until it was too late to stop the car.

In the Trochta Case, supra, the jury found that the deceased neither looked nor listened for the approaching train, and, as we understand the facts of that case, there was not much of an excuse, if any, for not looking and listening. Trochta was driving a team, and could have seen the train 50 feet before he reached the crossing. Our Supreme Court not only held that the facts of that case were sufficient to take this issue to the jury, but to sustain a finding acquitting the deceased of contributory negligence. In our judgment, this case is much stronger in plaintiff's favor than the Trochta Case.

But view the case from Hare's testimony: When Mrs. Roan was 50 or 60 feet from the crossing, the train was 4 or 5 blocks away, 1,500 or 1,600 feet. He says he saw her look towards the train and slow down her car. Later he said it appeared to him that she tried to beat the train over the crossing. She had lived in Orange for several years. It is to be presumed that she knew of the ordinance limiting the speed of trains to 6 miles an hour. Some of the testimony was that the train was running at a speed of 30 miles an hour. Had appellant been measurably obeying the law, Mrs. Roan would have crossed in safety. This testimony is sufficient to take to the jury the issue of whether an ordinarily prudent person, in the exercise of ordinary care would have tried to cross in front of this train, believing it could be done with safety. Railway Co. v. Gaddis (Tex. Com. App.) 208 S. W. 895.

If Mrs. Roan brought the car to a stop or almost to a stop just before the accident, the evidence fairly raises the issue that this was done at a safe distance from the railroad track. (See Hare's testimony.) If she then accidentally lost control of it, negligence would not follow as a matter of law. So, from this view of the testimony, Mrs. Roan was not guilty of contributory negligence as a matter of law.

We would add further that, as we construe the record, the quoted evidence is sufficient, not only to raise the issues submitted in the charges of the court on contributory negligence, but to sustain the jury's verdict in plaintiff's favor. In passing on these fact issues, it is our duty to consider the testimony most favorably from plaintiff's standpoint, and, if there is a conflict, to reject that favorable to the defendant　Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S. W. 139.

On the issue of contributory negligence the jury were asked, in question 8:

"Was the deceased, Mrs. Zollie Roan, wife of the plaintiff, W. G. Roan, guilty of contributory negligence as hereinbefore defined?"

In connection with this charge, the court grouped all the issues entering into the charge of contributory negligence, and instructed them as to the effect of their finding. This question was answered in favor of plaintiff. The court also submitted to the jury question No. 12:

"Could the deceased, Mrs. Zollie Roan, by the exercise of ordinary care, have seen the approaching train in time to have stopped her automobile before the collision?"

—and on request of appellant special issue No. 5.

"(a) Did Mrs. Zollie Roan see the approaching train in time to have stopped her automobile before the collision?　(b) Was the failure of Mrs. Zollie Roan to stop the automobile before it collided with the train the cause, or did it contribute to the resulting collision between the automobile and the defendant's engine?"

Had the jury answered these questions, as appellant contends they should have been answered, Mrs. Roan would not be convicted of contributory negligence. Negligence would not follow as a matter of law from an affirmative answer. The court had correctly submitted Mrs. Roan's negligence to the jury in connection with question 8 above referred to, and, if appellant desired a fuller or further submission, he should have requested it. Referring to question 12, it was not a question as to what Mrs. Roan could have done in the exercise of ordinary care, but what an ordinarily prudent person would have done in the

230 S.W.—68

same or similar circumstances. In Hines v. Arrant, 225 S. W. 768, the court said:

"If every one injured in a railroad collision who could by looking and listening discover the approach of the train before going upon the track is to be charged with contributory negligence, it would be. difficult to find an instance in which that defense would not be fully established. The situations are exceedingly rare in which travelers cannot, if they will, ascertain whether or not it is safe to attempt a crossing. But the legal test is, not what the traveler could have done had he used his senses, but what an ordinarily prudent person would have done under the particular circumstances. Hence the courts have held that the failure to look and listen before going upon a railway track is not, as a matter of law, .contributory negligence. Trochta et al. v. M., K. & Ft. S. Ry. Co. (Com. App.) 218 S. W. 1038; Frugia v. T. & Ft. S. Ry. Co., 36 Tex. Civ. App. 648, 82 S. W. 814; H. & T. C. Ry. Co. v. Wilson, 60 Tex. 142."

Referring to special issue No. 5 requested by appellant, if Mrs. Roan saw the train in time to have stopped her automobile, before the collision, and if her failure to stop it before it collided with the train caused or contributed to cause the resulting collision, unless her conduct was negligence, plaintiff's cause of action was not destroyed. So though the jury had answered these issues in appellant's favor, still plaintiff would be entitled to a verdict under the answer to question 8.

The charge of the court on the measure of damages .is not subject to the assignment urged. Also we overrule the exception taken to the charge given in connection with question No. 8. If the charge were subject to the objection taken, the propositions advanced under the assignment are not germane to the exception, and have no relation to it.

[1] Plaintiff was given damages in the sum of $20,000 for the death of his wife, and $15,000 for the death of his son. Appellant assigns error against these answers, on the ground that the amount assessed .is excessive. Mrs. Roan was 26 years old, in good health, kept her house, and was faithful in the discharge of her duties as a wife. On authority of the recent holdings of our courts of appeal, we sustain the judgment for $20,000 for her death. In estimating the damages for the death of plaintiff's son, the jury were charged:

"The amount found by you, if any, must be limited to the value in money of the services of the son of plaintiff, W. B. Roan, during his minority, after deducting the probable expense of maintenance."

[2] Under this charge the damages were assessed at $15,000. He was an intelligent child, 4 years old. From the testimony, the jury might have concluded that he would develop into an obedient son and a good citizen, but all men know that a child has little earning capacity before he is 15 or 16 years of age. At least, to that age he is a constant care and expense to his parents. This charge limits plaintiff's recovery "to the value in money of the services of the son of plaintiff, W. B. Roan, during his minority, after deducting the probable expense of maintenance." In order for the future earnings of a child 4 years old to have a present cash value of $15,000, it would be necessary for him to earn $25,000 or $30,000 by the time he reaches 21 years of age. Measuring plaintiff's recovery by the charge of the court, the common experience of men teaches us that this is an impossible sum. But, as plaintiff pleaded and proved his case, the court was without authority to enlarge this measure of recovery. In West Lumber Co. v. Hunt, 219 S. W. 1106, after discussing the measure submitted in this case, we said:

"And in addition to that [referring to the measure of damages submitted in the court's charge], by reason of the statute of this state, the father would also be entitled to recover the value of such contributions or aid of a pecuniary nature as he had a reasonable expectation of receiving from the son after reaching his majority had he lived."

As we have just said, based on his common-law rights, plaintiff's judgment for the death of his son is excessive, but we shall not suggest a remittitur, as we are unable to say from this record whether plaintiff has an additional remedy under the statute. This view of the case necessitates a reversal as to this part of the judgment, and it is accordingly so ordered. In all other respects the judgment of the trial court is affirmed.

### On Appellant's Motion for Rehearing.

O'QUINN, J. On a former day of this term we affirmed the judgment of the lower court for $20,000 in favor of the plaintiff, W B. Roan, for the death of his wife, and reversed and remanded the judgment in plaintiff's favor for $15,000 for the death of his son.

Appellant has filed its motion for rehearing on that part of the judgment affirmed, urging as error practically all the errors assigned on the original hearing. After careful consideration of said motion, a majority of the court is of the opinion that the court was in error in overruling appellant's fourth assignment of error, which is as follows:

"Because the answer of the jury to question No. 8 [hereinabove set out] is not only against a preponderance of the evidence, but is without any evidence whatever to support same, and is so opposed to the undisputed evidence by both the plaintiff and defendant showing such a reckless disregard on the part of the jury of the facts proven as to indicate that they were controlled in their deliberation either by prejudice against this defendant or a bias in favor of the plaintiff."

The court, among other things, charged the jury:

"(1) By the term 'negligence,' as used in this charge, is meant the doing of something which an ordinarily prudent person would not have done under the same or similar circumstances, or the failure to do something which an ordinarily prudent person would have done under the same or similar circumstances.

"(2) By the term 'proximate cause,' as used in this charge, is meant that cause which in a continuous sequence, unbroken by any new, independent cause, produces an event or injury, and but for which the same would not have occurred. One's act or omission is the proximate cause of injury when it could have been reasonably anticipated by him that some such injury would result from such act or omission.

"(3) By the term 'contributory negligence,' as used in this charge, is meant such an act or omission on the part of the person injured amounting to a want of ordinary care as, concurring or co-operating with the negligent act or wrongdoing, is the proximate cause of the injury complained of.

"Bearing in mind the foregoing instruction, you will answer the following questions, which are hereby submitted to you: 'Question No. 8: Was the deceased, Mrs. Zollie Roan, wife of plaintiff, W. B. Roan, guilty of contributory negligence as hereinbefore defined?' Answer 'Yes' or No.' In this connection you are instructed that, if the deceased Mrs. Zollie Roan, by the exercise of ordinary care, could have seen the approaching train in time to have stopped her automobile before the collision between the automobile and the train, if she had been keeping a lookout for said train, or that she discovered the approach of defendant's engine prior to the time that the automobile went on the track, or that she lost control of the automobile, or that she discovered the approach of the engine prior to the time that her automobile went on the track and brought the car to a stop or almost to a stop and then in some manner caused same to lurch or move forward on the track in front of the approaching train, and you further believe that a person of ordinary prudence in the exercise of ordinary care would have seen the train in time to have stopped the automobile before the collision, or that a person of ordinary prudence in the exercise of ordinary care would not have lost control of the automobile, or that a person of ordinary prudence in the exercise of ordinary care would have discovered the approach of the engine prior to the time that her automobile went on the track and would not have stopped her car or almost stopped, and then in some manner caused same to lurch or move forward onto the track in front of the approaching engine, and that such act or acts, omission or omissions were a proximate cause of her death, then you are instructed that the plaintiff was guilty of contributory negligence, and will answer the above question 'Yes,' "

The jury answered said question "No." By their answer to the above question the jury found, among other things, in effect: (1) That Mrs. Roan could not, by the exercise of ordinary care, have seen the approaching train in time to have stopped her automobile before the collision between the automobile and the train if she had been keeping a lookout for said train; (2) that she did not discover the approach of defendant's engine prior to the time that the automobile went on the track; and (3) that a person of ordinary prudence, in the exercise of ordinary care, would not have seen the train in time to have stopped the automobile before the collision.

The court, in question No. 8, instructed the jury that if from the evidence either of the above matters contained in said charge were found to be true, and that such act or acts, omission or omissions, were a proximate cause of Mrs. Roan's death, then she would have been guilty of contributory negligence, and that in such event they would answer said question "Yes."

[3, 4] Appellant insists that the jury's answer to said question No. 8 is not only not supported by the evidence, but is against the great preponderance of the evidence, and so opposed to the undisputed evidence by both plaintiff and defendant as to show such a reckless disregard on the part of the jury of the facts proven as to indicate a want of fairness in their deliberations in arriving at a verdict. The question of whether Mrs. Roan, under the circumstances, was guilty of contributory negligence as a matter of fact, depended upon the answer of the jury to the matters inquired of in said question No. 8. The first is:

"Could Mrs. Roan, by the exercise of ordinary care, have seen the approaching train in time to have stopped her automobile before the collision between the automobile and the train, if she had been keeping a lookout for said train."

This question is also submitted in a little different form in question No. 12, to wit:

"Could the deceased, Mrs. Zollie Roan, by the exercise of ordinary care, have seen the approaching train in time to have stopped her automobile before the collision? Answer 'Yes' or 'No.' "

To which the jury answered "No."
Question No. 9 was as follows:

"Did Mrs. Zollie Roan, while approaching the railroad crossing, keep a lookout for an approaching train? Answer 'Yes' or 'No.' "

To which the jury answered "Yes."

Mrs. Roan in approaching the point where the railroad track crossed Park street (where the accident occurred) was traveling along Park street, and the undisputed evidence showed the railroad track, in the direction from which the train was coming, to be open to view from a point on said street 120 feet from the center of said crossing for 1,000 feet; at 60 feet from the center, 1,600 feet; at 50 feet from the center (on the property line, or edge of right of way), 2,500 feet; and at 25 feet from the center, for probably a mile; and that the track in that direction was straight for some 3 miles. This was shown by pictures and blueprints taken and made just after the accident, and also by the testimony

of witnesses. Miss Mavis Roan, introduced by plaintiff, testified:

"Before the accident I had been living in Orange about two years and was acquainted with the railroad crossing at Park avenue (where the accident occurred). My sister, surely, also knew about this crossing. I don't know that there was anything to prevent me and my sister from seeing that engine up the track. We just didn't see it.

"Q. Isn't it an open view there, no houses, a perfect open view so you can see everything, isn't it? A. Well, almost; yes, sir. I don't think we could have seen the railroad track if we had looked in the direction the train was coming right at Mrs. Thomas' house, but I could just a little piece from it."

B. C. Hare, introduced by plaintiff, testified:

"I went out to the place of accident to-day. There is a house and some telegraph poles there to prevent a view.

"Q. How far beyond the first cattle guard could you see from where the car was? A. I could see a good piece—oh no, I couldn't see but about a block and a half from where she first slowed down."

Upon being asked if there was anything else in the direction the train was approaching to prevent any one seeing down the track 400 or 500 feet, or even a mile, he says:

"Yes, sir; there is a house. The house is not on the right of way. There is a curve there."

Then, upon being asked if there was a curve in that track for over a mile or for three miles, he says:

"I don't know."

Then, upon being asked if he did not know there was no house on the right of way, he stated:

"There was none. There was nothing to prevent an engineer seated in his cab from seeing a person 60 feet from the side of the track. There was no obstruction in his way, no house, telegraph poles in his way."

Upon being cross-examined that, if there was nothing between the engineer and a person 60 feet from the track, there would be nothing between the person and the engineer, he answered:

"Yes, sir; but the engineer could see better from the cab looking from that way than she could because of that house."

Upon being asked, if the house obstructed her view, did it not at the same time obstruct the engineer's view, he answered:

"I don't know whether it would obstruct his view or not. I don't know if the same obstruction that obstructs the view of one person would obstruct the view of others or not. I don't know whether he could ·see better than she could. I couldn't say."

L. F. Daniels, civil engineer, introduced by plaintiff, testified:

"I am a civil engineer and have been in that business about 30 years in this state and in the state of Georgia. I made a survey of the distance from Park avenue down to the place where I saw the engine with the automobile attached on it. This is the sketch (indicating) that I made. I measured the distance along from near the center of Park street where the vehicles cross, measured down the railroad a distance practically 800 feet. (Blueprint is introduced as a portion of his testimony.) When the accident occurred, I was not at Park avenue. I was down there a few minutes afterwards, where it stopped before they got the car off the engine and cowcatcher."

On cross:

"I don't know exactly where the car was struck on Park avenue. The distance I measured was 800 feet from near the center of Park avenue. I did not measure the blocks. I only copied from a map which had these figures on it. I did not measure the blocks, only copied them from something else. I don't know the difference between block 101 and block 82, and I did not make the map from which I copied. Blocks 101, 82, 102, and 81 are approximately 800 feet. I make no observation of the car while I was making these measurements. I am thoroughly familiar with the conditions down there."

The witness was here requested to go down and make some observations at noon and report back to the court after noon, and was excused.

L. F. Daniels, recalled, testified:

"I testified this morning, and since that time I have been out on the ground and have made some observations there.

"Q. On this map please explain to the jury just what you saw as to distance you looked and points you looked from. A. Well, I estimated the distance from the center of the track on Park avenue down Park avenue about as near as I could guess it at 120 feet, and I could see about 1,000 feet down there [the track]. I could see in a northeasterly direction about three blocks down the track. Then I went nearer, 60 feet, halfway from this point here (indicating on the map) up to the track, and I estimated the distance I could see down the railroad track 1,600 feet. From that point I could see north down the track 1,600 feet, and then I got on the property here, or near it, and I estimated I could see north down the track 2,500 feet. I then estimated the distance halfway between· the track and the property line, or 25 feet from the track, and I could see probably a mile down that track. That track looking in that direction is straight. The property line, as we designated it, is 50 feet from the center of the track."

On cross-examination he says:

"I stated that, standing here between Cherry and Orange streets about a quarter of a block from Cherry, I could see a car on Park avenue 55 or 60 feet from the center of the track. Immediately on the property line looking down to the northeast down the track right on the property line the telegraph poles would obstruct the view. Just at that point where the telegraph

poles are would obstruct it so you could not see more than 700 or 800 feet down there.

"Q. Isn't it a fact that, viewing it from that angle and that situation, you can't see up that track for more than 50 or 60 feet beyond the cattle guard on John street? A. That is exactly immediately behind these poles; yes, sir. Apparently there is nothing at all to obstruct a view of an engineer in his cab and the fireman in his place in the cab from Berton street clear on down beyond Park avenue, that I observed; nothing to prevent the engineer from seeing a car in 30 or 40 feet of the track." ·

On redirect:

"There isn't anything to prevent a party riding in an automobile from seeing an engine and train after he passes the property line, for nearly a mile, not after he passes the telegraph poles. If you get right immediately behind them, exactly in line with them, of course, it obstructs a little bit. It is just at that one identical point, but 2 or 3 feet either way away the space is clear. I noticed that."

C. H. Grubbs, introduced by defendant, testified:

"I went with Mr. Daniels, the surveyor, at noon and made some observations on the track. We stopped 125 feet west, I believe, and took observation there. Then we came up another distance and took another observation, and we came nearer until we got within 25 feet of the track looking in a northeasterly direction. We made a little sketch, and I can give you the distances we agreed on. We stopped on Park avenue within 120 feet of the crossing, and looking in a northeasterly direction we could see down the track 1,000 feet, according to our estimate. We made our next observation at 60 feet from the track, and we estimated that we could plainly see 1,600 feet down the track. Our next observation was 50 feet from the crossing. We estimated we could see 2,500 feet in a northeasterly direction. We then went within 25 feet of the track, and we decided we could see a mile down the track. In that block from a point 50 feet or even 100 feet from the track there isn't a thing to prevent a person from seeing an engine or a train 300 or 400 feet in a northeasterly direction. It is open, open all the way for 1,000 feet. We observed that."

On cross:

"There are two lines of telegraph poles down there. Standing immediately west of the telegraph poles, I think I would be safe in saying I could see up the track 1,000 feet. It is plumb open."

Mrs. (Dr.) J. H. Thomas, introduced by defendant, testified:

"I live in Orange. I remember the accident about the 10th of October at Park avenue when a passenger train struck an automobile. It was in the afternoon about 5 o'clock. I had started over to Mrs. Howell's on Park street, and as I left my place and entered Twelfth street I noticed a car coming down Park street, and as I advanced further I noticed that the two ladies on the front seat were talking, looked at me as though they were talking about me, and they kept going, and I heard the train coming, and I supposed they did, too. I was on the east side of the street, and Mrs. Roan looked at me, turned her head to the east. The auto was running at a moderate rate of speed (not more than 8 or 10 miles per hour), and after looking at me the second time, then Mrs. Roan looked back toward the train. The auto was then about three-fourths of a block from the crossing. Before the automobile passed, I had heard the train coming, but am not positive as to whether I heard it blow until just before it reached the crossing. The block north of the crossing and east of Park street is open, and I thought sure Mrs. Roan and the others knew the train was coming, as there was nothing to keep them from seeing it, and as I continued to watch the car I saw it was not stopping, and as I could see the train, I was certain the car was going to be struck. The auto did not slow down but little, if any, until it reached the track or about the track, and then I saw Mrs. Roan trying to stop the car. The auto appeared to jerk or lurch two or three times before the engine hit it, and I don't believe Mrs. Roan stopped it before it was struck. If she did, it was right in the middle of the track. I don't think the auto slowed down but very little until the track was reached, although I am sure Mrs. Roan was trying to set the brake. It jerked and jumped forward two or three times just before it was struck. The driver of the car was a small lady, and it appeared that the car first started to jumping or lurching when it was more than half the distance up the dump. * * * Approaching the crossing the train did not appear to be running unusually fast. I would say it was running about the usual speed. * * * I was standing about three-fourths of a block north of the crossing. * * * As I have stated above, there was absolutely nothing to have obstructed the view of the occupants of the car of the approaching train. * * *"

G. C. Strickland, introduced by the defendant, testified:

"I live in Orange. On October 10, 1918, the time that Mr. Roan's car driven by his wife came in collision with a train on Park street, I was at home on Eleventh and John streets. I didn't see the accident, but I saw the train when it passed there that day. * * * I am acquainted with that block adjoining Park avenue, leading up towards the way the engine approached it. There are no houses or anything along there to obstruct the view; a bunch of weeds is all."

J. P. Rodan, introduced by defendant, testified:

"At the time of the accident that happened down here on Park street in Orange, in which a train ran into an automobile being driven by Mrs. Roan, I was one rail and a half below the crossing; that would be coming towards the station. I was going on down the track. * * * At that time I noticed the automobile coming, but did not pay much attention to the car until it was getting so near the crossing, and I commenced paying attention to it. When she got about 15 feet of the rail I thought she was going to stop. When she got within about

5 feet of the rail she come to a dead stop and the train was about a rail and a half from the car, and the car made two little jumps and went on the track. The best of my knowledge from where I was at, looking at the car, she kind of got it in neutral and let her foot slip off the clutch and jumped it on. When the car stopped, the engine was about 1½ or 2 rails from it. I heard a woman scream and I couldn't say positively where the scream came from. When the train hit the car I was in between the main line and the passing track. * * * When I first noticed the train, it was coming in down up there at Berton street. From Park street north the track is straight for about 3½ miles. I know it is straight track for 3½ miles, for my wife and I would go walking down that way. When I heard the train whistle, I looked back to see the train. I was still walking between the two tracks between the main line and the passing track between John and Park avenues along here (indicating on map) when I first noticed the train. When I first heard the train whistle, I looked back and the train was then below Berton street. * * * From where I was at the time the accident occurred clear up to Berton street, straight up the railroad track, there is nothing to prevent a person from seeing an automobile on Park street for a block and a half. There is nothing to keep you from seeing it; that is, you can see angling from a block and a half this way."

The jury found in answer to question No. 9 that Mrs. Roan, in approaching the crossing, did keep a lookout for a train, and by their answer to question No. 8 (second clause or subdivision of same) that she did not see the train prior to the time her automobile went onto the track, and in answer to first clause or subdivision of question No. 8 and question No. 12 that she could not, by the exercise of ordinary care, have seen the approaching train in time to have stopped her automobile before the collision. L. F. Daniels, a witness originally placed upon the stand by plaintiff, who thereby vouched for his integrity and veracity, a civil engineer of 30 years' experience, apparently without interest, bias, or prejudice, testified, after a careful examination of the premises, that a person standing at a distance of 120 feet of the crossing on Park avenue (Mrs. Roan was driving along this street in approaching the crossing) could see 1,000 feet down the track in the direction the train was approaching; that at 60 feet from the crossing he could see 1,600 feet down the track, and that on the property line (50 feet from the crossing—the edge of the right of way) he could see 2,500 feet down the track, and that at 25 feet from the crossing he could see a mile down the track, and that the track was straight; that right at the point where the telegraph poles would obstruct the view a person could see some 700 or 800 feet down the track, and 2 or 3 feet away from that point in either direction, he says, the space was clear; that there was nothing to prevent a person riding in an automobile along the street there approaching the

crossing, as was Mrs. Roan, from seeing a train after passing the property line (the edge of the right of way, 50 feet from the crossing) for nearly a mile. C. H. Grubbs, who was with Daniels when he was making the observations he testified to, and who is apparently a disinterested and unbiased witness, testified to the same facts, and their testimony was not disputed by any other witness, nor in any wise questioned. It was broad, open daylight, nothing to obstruct the view, nothing in the record to show bad places in the street or other things to require Mrs. Roan's attention away from the crossing where the train was approaching, nothing to prevent her from exercising that ordinary care for her own safety that the law requires one should exercise. The rumbling of the approaching train (not to say whether the whistle was blown or the bell rung), and it being shown in the record that Mrs. Roan did look in the direction of the train (Mrs. Thomas testified that Mrs. Roan looked towards the train, and that she, Mrs. Thomas, could see the train, and that she thought Mrs. Roan saw it, as there was nothing to keep her from it; B. C. Hare testified that the automobile was on Park avenue going towards the crossing when he first noticed it, some 50 or 60 feet from the crossing, and that the lady, Mrs. Roan, looked down the track, and that he could see the train at the time), and yet the jury, in their answers to questions Nos. 8, 9, and 12, found that Mrs. Roan did not see the train, and that by the exercise of ordinary care could not have seen same, even though she had been keeping a lookout for same, in time to have stopped her automobile and have avoided the collision. To our minds, the said findings of the jury are squarely against the overwhelmingly preponderating weight of the evidence, and indicate either a lack of proper consideration of the testimony, or bias in favor of plaintiff, or prejudice against the defendant.

This inclination on the part of the jury, it seems to us, is indicated also in their answer to question No. 3, which is:

"* * * Did the train in question give any signal by blowing of a whistle in approaching the crossing where the accident occurred at the time it occurred? Answer 'Yes' or 'No.'"

To which the jury answered "No." On this question the following is the record:

Miss Mavis Roan, introduced by plaintiff, among other things, testified:

"I did not hear the bell ring or the whistle blow. I did not hear a sound. The first thing I knew after being driven upon the railroad track was the crash when the train hit the car. The first thing that attracted my attention was the auto slowing up. I never did see the train."

The record disclosed that this witness was talking and looking backward until the track

was practically reached, as appeared from other portions of her testimony.

B. C. Hare, introduced by plaintiff, among other things, testified:

"I did not hear the whistle blow or the bell ring, nor did I see any member of the train crew give any signal to warn persons crossing Park avenue that the train was approaching. I was looking at the train, and did not see any steam rise from the whistle, evidencing that the whistle had been blown."

Dr. J. D. Thomas, introduced by plaintiff, among other things, testified:

"I reside at 12th and Orange streets and was sitting on my north gallery. I did not hear the train whistle or the bell ring."

J. P. Rodam, introduced by defendant, among other things, testified:

"I was going down the track and was about one and a half rails length from the crossing when the accident happened. * * * I am positive I heard the train whistle as she came in. * * * The first thing that attracted my attention was the train whistling; they (the little boys) were on the track when the train whistled, and I hollered to them to get off, that the train was coming. When I heard the train whistle I looked back to see the train. I was still walking between the two tracks, between the main track and the passing track between John street and Park avenue. * * * When I first heard the train whistle, I looked back and the train was then below Berton street. When I heard the train whistle I was between Park avenue and John street; when the train first whistled it was the other side of Berton street."

Mrs. T. A. Howell, introduced by the defendant, testified among other things:

"I was living at 1207 Park avenue. I was sitting in my living room right by a big window facing north where I could see up the railroad track."

Upon being asked had she heard the train in any way, she answered:

"Yes, sir; I think, I am sure, something attracted my attention to the train quite a distance up the track."

J. M. Coleman, introduced by the defendant, among other things, testified:

"I was in my back yard between John street and Eleventh street. As the train came I noticed he (engineer) blew for the station. I heard the whistle blow for the station and just before he got to my house he blowed for the crossing. As the train passed I watched it as it rolled by. When it first blew the station whistle I couldn't tell just how far it was from me, but he blew the crossing whistle just before he got to my house and just before it passed John street he blew the whistle again. I am certain it made these two whistles. * * * It whistled for Park Street crossing, and it whistled for the crossing after it passed John street. I heard the train whistle for the first time before it got to my house. The first whistle I noticed was the station whistle about the

yard limits. I did not notice the train until it passed my house; I just heard the whistle. It whistled before it came to John street regular crossing, whistled before it got to John street. It whistled at each of the streets as it came by; they gave the regular street whistle for each one of the streets."

Mrs. (Dr.) J. H. Thomas, introduced by defendant, among other things, testified:

"Before the automobile passed I had heard the train coming, but am not positive as to whether I heard it blow until just before it reached the crossing."

J. L. Walker, engineer, introduced by defendant, testified:

"Coming in that day the whistle was sounded for stations and crossings. I remember the whistle was blown, remember that distinctly, because that accident will dawn on me the rest of my life. * * * When I rolled into the city of Orange I blew the whistle and applied the brakes back in the switch to reduce the speed of the train."

G. C. Strickland, introduced by defendant, among other things, testified:

"I was at home on Eleventh and John streets. I believe I heard the whistle blow before the accident, but I don't know where it was. I was in the house, and just walked out when the train passed. * * * I couldn't say positively whether I heard the whistle up there or not; I did not hear the whistle when it got to John street. I didn't hear the whistle at Park avenue."

E. J. Ferth, fireman, introduced by defendant, among other things, testified:

"The station whistle was blown at the mile board as usual and there were several crossing whistles blown. The engineer blew these whistles. The engineer blew his whistle for each of these crossings. When he blew for the city at the mile board he shut the steam off and began rolling in. He blew the whistle, and it was then that he shut off the steam."

J. H. Holloman, introduced by the defendant, among other things, testified:

"I was in the smoker. * * * He, the engineer, whistled for the station and also for the road crossing. I heard the whistle for the station and then for the road crossing."

We also consider that the inclination of the jury, above discussed, is further indicated by the answer to question No. 4, to wit:

"* * * Did the train in question give any signal by the ringing of a bell in approaching the crossing where the accident occurred, at the time it occurred? Answer 'Yes' or 'No.'"

To which the jury answered "No." The record on this issue disclosed the following:

Miss Mavis Roan, introduced by plaintiff, testified:

"I did not hear the bell ring. I didn't hear a sound."

B. C. Hare, introduced by plaintiff, testified:

"I did not hear the bell ring."

John Bland, introduced by plaintiff, testified:

"I never noticed the train until I heard the crash. Then I saw part of it."

Dr. J. D. Tomme, introduced by plaintiff, testified:

"I was at home on Twelfth and Orange streets. I did not hear the bell ring."

J. P. Rodam, introduced by defendant, testified:

"I was on the railroad track a short distance from the crossing going in the direction of town. I hollered at them [two little boys who were on bicycles on the track], and told them to get off, but they did not pay any attention, and I had to use some pretty rough words at them to get them off. They ran together and fell and at that time I heard the train whistle up at Berton street, and she continued to whistle and ring the bell."

Mrs. T. A. Howell, introduced by defendant testified (upon being asked if she heard the train):

"Yes, sir; I think, I am sure, something attracted my attention to the train quite a distance up the track."

J. M. Coleman, introduced by defendant, testified:

"I was in my yard between John and Eleventh streets watching the train as it passed. I don't remember for certain, but my impression is that the bell was ringing on that engine when it passed my house. I am not certain about this, but my impression is that it was ringing."

Mrs. (Dr.) J. H. Thomas, introduced by defendant, testified:

"I heard the train coming. I supposed they did, too. I cannot state as to whether the engine bell was ringing or not."

J. L. Walker, introduced by defendant, testified:

"Coming in that day the whistle was sounded for the station and crossings and the bell was ringing also."

G. C. Strickland, introduced by defendant, testified (was at his home on Eleventh and John streets, and saw the train when it passed):

"As well as I remember, the bell was ringing when it passed my house. My house is about 1½ blocks from the place of accident. My recollection is that the bell was ringing when it passed there * * * I am sure I heard the bell ringing."

E. J. Ferth, fireman, introduced by defendant, testified:

"The bell was ringing, because I was supposed to ring it. It was an automatic ringer, and all I had to do was to turn it on. I had turned it on. It did not stop ringing until about five minutes after the accident, I guess. I shut it off. It was not shut off until after the accident. At the time the train came to a stop it was ringing. * * * The bell working automatically was ringing and wasn't cut off until after the engine stopped. I got down and went around to the front of the engine and saw what had happened and came back up there and shut the bell off."

[5] The jury answered questions No. 3 and No. 4 "No," thereby finding that neither the whistle was blown nor the bell rung at the time of the accident. The above record discloses, so far as the affirmative testimony is concerned, unquestionably, that the whistle was blown and the bell was rung. The only conflict in the testimony is in the negative testimony given by the witnesses introduced for plaintiff that they did not hear the whistle blown nor the bell rung. The only thing in the way of affirmative dispute in the matter is in the testimony of B. C. Hare that he was looking at the engine and did not see any steam indicating that the whistle had been blown, but it is not shown at what particular time he was looking at the engine, as to whether it was before, after, or at the time the whistle was blown for the station, if blown, or the crossing. He had purchased a paper just a few moments before, and while he says he did not see any steam rise indicating the whistle had been blown, yet he does not positively state the whistle was not blown, or that he could and would have heard it if it had been blown. Affirmative evidence is entitled to more weight than merely negative evidence.

Judge Fly, in the opinion of I. & G. N. Ry. Co. v. Arias, 30 S. W. 446, in discussing a case involving this question, says:

"The only evidence that was introduced to show that the whistle was not sounded at the curve was that of appellee, who swore that he did not hear it. Such a statement, with no accompanying facts to show a probability that the witness would have heard the signals, had they been given, is merely negative, and not of such character as to form testimony upon which to base a verdict."

In Moran v. Railway Co., 48 Minn. 46, 50 N. W. 930, the Minnesota Supreme Court, in discussing this question, says:

"The mere statement by a witness that he did not hear it would, of itself, be no evidence that the bell was not rung."

In Railway Co. v. Arias, supra, the court further said:

"It must be kept constantly in view that the burden rested upon appellee to show that appellant was guilty of negligence in causing the injury to him, and, having alleged that one ground of negligence was the failure to give the signals, it was incumbent on him to introduce evidence, not only that he did not hear the

signals, but that they were not given. That he did not hear the signals was a mere circumstance, which was or was not sufficient evidence upon which to base a verdict, according as it was supported by other circumstances tending to show that the signals were not given. We are left in uncertainty by the evidence as to the conditions surrounding appellee at the time it is said the signals were given. He may have been in a position in which it was utterly impossible for him to have heard, either on account of the rattle of the hand car, or conversation that may have been carried on by the section men. The circumstances detailed should have affirmatively shown at least a probability that the signals would have been heard had they been given. Unaided by said circumstances, there was no testimony to override the positive facts sworn to by a number of witnesses, and which facts are not inconsistent with any of the details of the case. There are occasions in which negative testimony might, in the face of positive testimony, sustain a verdict, but in such cases not only must the comparative credibility of the witnesses be placed in the balance, but there must be something by which the means of knowledge can be weighed. Where such testimony as we are considering is relied on for a verdict, it devolves upon the party introducing it to show that he was where he would probably have heard the bell had it been rung, or the whistle, had it been sounded."

In the instant case all the positive testimony is to the effect that the whistle was blown and the bell was rung; the other witnesses merely testifying that they did not hear it. There is nothing shown in the record as to whether, by their surroundings, if the signals had been given, they would probably have heard them, and we do not believe that this evidence, merely negative in character, was sufficient to preponderate over the several witnesses, apparently disinterested and unbiased, who swore positively they did hear both the whistle sounded and the bell rung.

Another circumstance pointing to the inclination of the jury in finding their verdict is that by their verdict they assessed plaintiff's damages for the loss of his wife at $20,000, and for the loss of his four year old son at $15,000. We reversed and remanded on original hearing that part of the judgment for $15,000 for the killing of the child, Judge Walker rendering the opinion. On that subject he says:

"Plaintiff was given damages in the sum of $20,000 for the death of his wife, and $15,000 for the death of his son. Appellant assigns error against these answers on the ground that the amount assessed is excessive. Mrs. Roan was 26 years old, in good health, kept her house, and was faithful in the discharge of her duties as a wife. On authority of the recent holdings of our courts of appeal, we sustain the judgment for $20,000 for her death. In estimating damages for the death of plaintiff's son, the jury were charged: 'The amount found by you, if any, must be limited to the value in money of the services of the son of plaintiff, W. B.

Roan, during his minority, after deducting the probable expense of maintenance.'

"Under this charge the damages were assessed at $15,000. He was an intelligent child 4 years old. From the testimony the jury might have concluded that he would develop into an obedient son and good citizen, but all men know that a child has little earning capacity before he is 15 or 16 years of age. At least to that age he is a constant care and expense to his parents. This charge limits plaintiff's recovery to the value in money of the services of the son of plaintiff, W. B. Roan, during his minority, after deducting the probable expense of maintenance. In order for the future earnings of a child 4 years old to have a present cash value of $15,000, it would be necessary for him to earn $25,000 or $30,000 by the time he reaches 21 years of age. Measuring plaintiff's recovery by the charge of the court, the common experience of men teaches us that this is an impossible sum."

In the case of Railway Co. v. Johnson, 224 S. W. 282, a case where a train ran over an automobile, and where the questions were similar to those in the instant case, on motion for rehearing, Judge Dunklin said:

"As shown in our original opinion, the jury by their verdict assessed plaintiff's damages for the loss of her husband in the sum of $30,000, of which amount $18,000 was found by the trial judge to be excessive, and a remittitur of that amount was filed by plaintiff in the trial court. The award of damages so excessive cannot reasonably be explained upon any other hypothesis than that of bias in the minds of the jury in favor of the plaintiff. The rule is well settled that in cases of this character improper argument by counsel for plaintiff, calculated to appeal to the sympathy or prejudice of the jury, will furnish a valid reason for the reversal of a judgment in behalf of plaintiff. Kansas City, M. & O. Ry. Co. v. Cave, 174 S. W. 872, and decisions there cited; Gordon, Jones Const. Co. v. Lopez, 172 S. W. 987, and decisions there cited; Chicago, R. I. & T. Ry. Co. v. Musick, 76 S. W. 219. The principle controlling in such cases applies with special force in the present suit, in which bias in the minds of the jury is so strongly shown.

"As appears in our opinion on original hearing, the testimony introduced tended strongly to support the defense of contributory negligence on the part of plaintiff's deceased husband, and almost conclusively and as a matter of law established contributory negligence on the part of Simmons, the driver of the automobile, in failing to observe the approach of the train in time to stop his car before reaching the crossing. Notwithstanding that evidence, the jury, in answer to special issues, found that neither Simmons nor plaintiff's deceased husband was guilty of contributory negligence in those respects.

"Under such circumstances, it is reasonably probable that bias in the minds of the jury in plaintiff's favor in assessing damages in such an excessive amount influenced them also in their finding in plaintiff's favor against the defense of contributory negligence on the part of the husband; and for that reason we have reached the conclusion that the motion for re-

hearing should be granted, the judgment of the trial court should be reversed, and the cause remanded for another trial."

[6, 7] The jury were the judges of the credibility of the witnesses, but they had not the right to arbitrarily reject the evidence of unimpeached and apparently disinterested and unbiased witnesses, against whom there was no discrediting circumstance. The jury were the judges of the weight of the evidence, but they could not lawfully deny proper weight to undisputed facts. If the jury had the power to discredit any and every witness and to disregard any and all facts, their verdict could not be set aside by the judge nor reviewed by the appellate courts.

[8] We think the verdict of the jury, in answer to question No. 8, is not only not supported by the preponderant weight of the testimony, but is so opposed to same as to show on the part of the jury a disregard of the court's instructions, and the evidence introduced on this issue, and it is well settled that, where the verdict of the jury is manifestly wrong, it is the duty of the court to reverse the case and remand for another trial. Willis v. Lewis, 28 Tex. 191; Railway v. Schmidt, 61 Tex. 286; Missouri Pac. Ry. v. Somers, 78 Tex. 439, 14 S. W. 779; Fraternity v. Melton, 102 Tex. 402, 117 S. W. 788; Joske v. Irvine, 91 Tex. 582, 44 S. W. 1059; Railway v. Loeffler, 59 S. W. 558; Railway v. Walters, 49 Tex. Civ. App. 71, 107 S. W. 372; Railway v. Brice, 111 S. W. 1095; Toole v. Moore, 203 S. W. 436; Railway v. Wagner, 224 S. W. 382.

The Supreme Court, in the case of Willis v. Lewis, 28 Tex. 191, says:

"It is the peculiar and legitimate province of the jury, where the evidence is contradictory, and a verdict must be found on the conflicting statements of witnesses, to decide on the weight and credibility of the testimony; and, on principles long established and repeatedly acted on in this court, their verdict will not be disturbed under such circumstances. And, under any circumstances, a verdict must appear to be clearly wrong to induce this court to set it aside, * * * but it is equally well settled that, when the verdict is clearly wrong, where the jury have found manifestly against the whole weight of the evidence, it is not only the right, but the duty, of the court to set it aside."

Judge Fly, in the Railway Co. v. Arias Case, 30 S. W. 447, says:

"It is with reluctance that the verdict of a jury is ever disturbed by an appellate court, but, when it is obvious that the evidence preponderates to such an extent against a verdict as to render it practically unsupported by, it, the court will set it aside."

In the case of Railway Co. v. Schmidt, 61 Tex. 285, Judge Stayton said:

"While the verdict of a jury is entitled to great weight when rendered on evidence reasonably sufficient to sustain it, yet, when rendered contrary to evidence, or against the great preponderance of the evidence, and it is most likely that injustice has been done, trial courts should not hesitate to grant new trials.

"This court does not exercise the same latitude of discretion in this respect as does the trial court, but when it is manifest that a verdict is clearly contrary to evidence, it has never felt wanting in power to reverse a judgment based on such a verdict."

Believing we were in error in overruling appellant's fourth assignment of error, the motion for rehearing is granted, the judgment of the lower court is reversed, and the cause remanded.

HIGHTOWER, J. (concurring). Upon careful consideration of appellant's motion for rehearing in this case, I cannot escape the conclusion that this court was in error in the original opinion in declining to sustain appellants' contention that the jury's verdict acquitting Mrs. Roan of contributory negligence is so overwhelmingly opposed to the practically undisputed evidence as to suggest that bias or prejudice or some other improper motive actuated the jury in that regard; and I therefore concur with Justice O'Quinn in the opinion on rehearing reversing and remanding. The evidence relative to the issue of contributory negligence is so fully stated in the opinion by Justice O'Quinn as to require no further mention or discussion by me.

In conclusion, I might say that this court is not unmindful of the line of decisions in this state which hold that a person traveling on a highway over a railroad crossing, which is at the same time being approached by a train, would not be necessarily guilty of contributory negligence, in attempting to get over the crossing ahead of the approaching train, where, under all of the facts and circumstances attending at the time, a reasonably prudent person might believe that the crossing could be made before the train reached it. Such decisions, however, have no application to this case, either as made by the evidence or as found by the jury. Indeed, the jury in this case expressly found, in effect, that Mrs. Roan did not attempt to get over the crossing ahead of the approaching train after discovering it, but, on the contrary, found that she did not discover the approach of the train to the crossing, and could not have done so by the use of ordinary care. Nor does the evidence in this case disclose, as stated by Justice O'Quinn, that there was anything relative to the condition of the highway, which claimed the attention of Mrs. Roan as her automobile approached the crossing, and therefore excused her failure to ascertain the approach of the train to the crossing as held by another line of decisions in this state.

Believing, as I do, that the verdict of the

jury in this case acquitting Mrs. Roan of contributory negligence is so overwhelmingly opposed to the evidence of disinterested and unbiased witnesses as to suggest bias or prejudice, or some other improper motive on the part of the jury, I agree with Justice O'Quinn that the judgment as a whole, should be reversed, and the cause remanded for a new trial.

WALKER, J. (dissenting). I give the following reasons for my dissent from the judgment of my Brethren, reversing this case:

1. Twice before (Railway Co. v. Harrington, 209 S. W. 685, and Railway Co. v. Peveto, 224 S. W. 552) we have reviewed the facts of this crossing. We there held that the question of contributory negligence was for the jury. The material difference between the facts of these three cases is that Mrs. Roan could have seen the train a greater distance from the crossing. If contributory negligence was a question of fact in the Harrington and Peveto Cases, I cannot escape the conclusion that it was a jury question in this case.

2. In setting aside this verdict, my Brethren are in direct conflict with all the holdings of this court on similar facts since I have been on this bench. The Harrington and Peveto Cases, above referred to, are in point on this proposition. The Patella Case, 222 S. W. 615, in which Mr. Chief Hightower wrote the opinion, is much more in point. In that case he said:

"We could not consistently, in view of the expression of Judge Phillips, hold that Patella was guilty of contributory negligence as a matter of law, although we conclude as a fact, from all the evidence of his companions who testified on the trial, that neither he nor any of them looked or listened for an interurban car that might be approaching the crossing at the time Patella and his companions were approaching and attempting to make the same, nor did they use any other efforts to ascertain whether they might approach and make said crossing with safety to themselves."

True, he also found that there were some slight obstructions to the view of the approaching car; for instance, a line of telegraph poles 150 feet apart—we have that in this case—and some small palms. But he further found that the mortorman saw the men in the car, saw they were not watching for his approach, and blew the whistle as a warning. If the mortorman could see the men in the car, it would seem that they could have seen him. He also found that—

"The evidence also showed that the automobile was an open car, and there was nothing about the car itself to prevent the occupants from seeing the approach of appellant's interurban to the crossing had they looked in that direction. The evidence further shows that the occupants of the car were doing nothing out of the ordinary while driving along in the direction of the crossing, but were conversing and acting as persons usually do in driving along."

I am sure that neither he nor Mr. Justice O'Quinn would assert the proposition that an obscured crossing relieves one approaching it from the exercise of due care. As appears from the above quotation, he found that Patella and his companions used no effort to discover the approach of the car, and yet sustained the verdict acquitting them of contributory negligence. I am not able to follow my Brethren in the logic which sustains the verdict of the jury in that case, and on the slight distinction in the facts of these two cases convicts this jury of "bias or prejudice or some other improper motive."

Let us concede that Mrs. Roan was guilty of negligence in all of the respects submitted under question 8. They could have so believed, and yet acquitted her of contributory negligence, on the ground that such negligence was not the proximate cause of her death. We held against this proposition in the Harrington and Peveto Cases, above cited, and also in the Pearson and Skinner Cases (224 S. W. 708 and 713, respectively), but the Supreme Court granted writs of error in the last two cases in such emphatic terms that we have followed their notation in Kirby Lumber Co. v. Scurlock, 229 S. W. 975, and Railway Co. v. Diaz, 232 S. W. —. Neither of these cases has yet been officially reported. In the Scurlock Case he was found guilty of negligence by the jury in riding his velocipede on the railroad track ahead of an approaching train, knowing that, at the most it could be only a short distance behind him, but the jury found further that such negligence was not the proximate cause of his death. My Brethren joined me in sustaining that finding. In the Diaz Case we sustained the trial court in refusing a proper issue, submitting to the jury the negligence of Diaz, on the ground that it did not submit the issue of proximate cause. Diaz walked in front of an approaching engine, without the slightest obstruction to his view. The facts of that case may make a stronger defense against the charge of negligence than the facts of this case, but on a finding of negligence I am unable to see any difference on the issue of proximate cause.

3. This reversal is against the great weight of the current authority of this state on similar facts. Some of these cases I cited in the original opinion of this court. Mr. Chief Justice Hightower referred to the Trochta Case in his Patella opinion. The opinion of the Court of Civil Appeals in that case states that there was no obstruction to Trochta's view after he reached the railroad right of way. There was a small tree and telegraph poles, but they found it did not obstruct his view. On the facts thus summarized, Chief Justice Phillips said:

"The question as to whether, under all the circumstances, Trochta was guilty of negligence

in not looking or listening for the train, was for the jury."

As I construe the facts of the cases cited in our original opinion, some of them are much stronger against the injured party than the facts of this case; yet able judges, with the express approval of the Supreme Court, have sustained the verdicts of the juries in those cases.

4. My Brethren have convicted this jury of "bias or prejudice or some other improper motive." On what grounds?

(1) Because the jury found that the whistle was not blown and the bell was not rung. They find there was no positive testimony to that effect. Our original opinion quotes in full the testimony of Hare on this point. It seems to me that what he said comes clearly within any definition that could be given of positive testimony. But suppose it was against all the testimony. In the Patella Case, above referred to, we held that one of the findings of the jury was against all the testimony, and instructed the trial court not to submit it on another trial, unless the facts were different, but we did not intimate that the jury which made that finding was prompted by "bias or prejudice or some other improper motive."

(2) Because of the excessive verdict for the death of the little boy. Too often we order remittiturs on the ground of excessive verdicts to convict this jury of such serious charges on that finding.

(3) Because of the finding of the jury on issue No. 12, which is given in the original opinion and in Justice O'QUINN'S opinion. In their criticism of this finding they have overlooked a presumption which the jury had the right to indulge. Judge Jenkins said in Railway Co. v. Price, 222 S. W. 628:

"If there were any facts or circumstances which might have existed, the existence of which was not excluded by the testimony, the jury might have been justified in indulging the supposition that such facts did exist."

This principle is well sustained by the following authorities: Railway Co. v. Fred, 185 S. W. 896; Railway Co. v. Petty, 145 S. W. 1195; Railway Co. v. Stalcup, 167 S. W. 279; Railway Co. v. Levyson, 113 S. W. 569.

One could scarcely think of a more extreme statement of facts than those revealed in the Price Case to which to apply this principle. In this case appellant has made no statement showing Mrs. Roan's view of a train approaching from the other end of the track. My Brethren quote no testimony showing such view. They have not considered this presumption. If necessary to sustain this judgment, we should indulge the presumption that such view was obscured, in the absence of an affirmative showing that it was not. The duty rested on Mrs. Roan to watch for a train from that end of the track, and if, in attempting to protect herself from injury in that direction, she was forced to approach so close to the track that she was unable, in the exercise of ordinary care, to avoid a collision from the train coming from the other direction, this judgment should not be impeached. This presumption raised this as an issue of fact, and it is sufficient, in my judgment, to save the verdict from the criticism made of it by my Brethren. Is this presumption against the admitted facts? Some of the witnesses testify that Mrs. Roan looked up the track towards the approaching train. As to when she did this, the testimony is a little uncertain. We cannot presume that she willfully committed suicide and murdered her little boy and mother-in-law. Then, in the face of this record, as revealed by the statement given by Mr. Justice O'QUINN, the jury could have found that she looked in the direction of the approaching train when it was not within her view, or at a time when it was too late to avoid the collision.

(4) Quoting from Justice O'QUINN'S opinion:

"It was broad, open daylight, nothing to obstruct the view, nothing in the record to show bad places in the street or other things to require Mrs. Roan's attention away from the crossing where the train was approaching, nothing to prevent her from exercising ordinary care for her own safety that the law requires she should exercise."

Well, it was broad, open daylight in the Trochta, Kirksey, Patella and Price Cases, supra, with nothing at all to obstruct the view on the Price Case, and practically nothing in the Patella and Trochta Cases. No bad road was shown in the Kirksey Case, the only excuse offered being that his attention was called from the danger by some one who wanted to take a ride with him in his automobile. The facts given by us in our original opinion, under the first ground, excusing Mrs. Roan of contributory negligence as a matter of law, seem to me to present a stronger case in her favor than do the facts in the Trochta Case.

5. My Brethren have taken out of this case the issue that Mrs. Roan could have seen the approaching train, and in the exercise of ordinary care believed that she could cross in safety. Referring to this legal principle, they say (quoting from Chief Justice HIGHTOWER'S concurring opinion):

"Such decisions, however, have no application in this case, either as made by the evidence or as found by the jury."

It is true the jury found against the issue, but, in my humble judgment, this issue was clearly raised, both by the testimony of Hare and by Miss Roan, quoted in the original opinion.